UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| ROSEMARIE HUGHES, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | CAUSE NO. 1:16-cv-00023-SLC |
| COMMISSIONER OF SOCIAL SECURITY, *sued as Carolyn W. Colvin, Acting Commissioner of Social Security*,[1] | ) ) ) ) ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Rosemarie Hughes appeals to the district court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB").[2] For the following reasons, the Commissioner's decision will be REMANDED.

## I. PROCEDURAL HISTORY

On January 14, 2013, Hughes filed her application for DIB, alleging disability as of November 18, 2007. (DE 5 Administrative Record ("AR") 16, 159-60). Hughes was last insured for DIB on December 31, 2011 (the "DLI") (AR 193), and therefore, she must establish that she was disabled as of that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that with respect to a DIB claim, a claimant must establish that he was disabled as of his date last insured in order to recover DIB).

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (DE 8); *see* 28 U.S.C. § 636(c).

Hughes's claim was denied initially on February 19, 2013, and again on May 15, 2013. (AR 102-10, 112-18). Hughes filed a request for a hearing before an Administrative Law Judge. (AR 119-24). On August 12, 2014, Administrative Law Judge Terry Miller (the "ALJ") held a hearing, at which Hughes and Sharon Ringenberg, a vocational expert (the "VE"), testified. (AR 38-88). Hughes was represented by attorney Sarah Gillis at the hearing before the ALJ. (AR 38). On September 15, 2014, the ALJ issued an unfavorable decision, finding that Hughes was not disabled because, through the DLI, she did not have a medically determinable impairment or combination of impairments that was severe. (AR 22-36). Hughes requested that the Appeals Council review the ALJ's decision (AR 20), and the Appeals Council denied her request, making the ALJ's decision the final, appealable decision of the Commissioner (AR 1-3).

On January 21, 2016, Hughes filed a complaint with this Court seeking relief from the Commissioner's final decision. (DE 1). In her appeal, Hughes alleges that the ALJ erred by finding that she did not have an impairment or combination of impairments that was severe. (DE 10 at 2, 12).

## II. FACTUAL BACKGROUND[3]

### A. Background

At the time of the ALJ's decision, Hughes was 55 years old. (AR 45). She has a high-school education and completed a computer course at Ivy Tech Community College of Indiana. (AR 46). Hughes's employment history includes work as a bank teller, a server at a restaurant, a customer service representative, and a machine operator. (AR 49-51).

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 385-page administrative record necessary to the decision.

*B. Hughes's Testimony at the Hearing*

At the hearing Hughes testified as follows: She is about five feet, eight inches tall and weighs approximately 112 pounds. (AR 45). Hughes lives with her husband of 31 years in a house they are purchasing. (AR 46-47). She has one biological child and three stepsons, all of whom live outside the home. (AR 45-46). Hughes's husband is employed, and Hughes does not receive assistance of any sort. (AR 46). She has a driver's license and is able to drive. (AR 47). Hughes does not have a primary care physician. (AR 55-56). Hughes used to smoke but quit in 2014 because it was too expensive and because her doctor said she needed to quit. (AR 68).

Hughes suffers from severe degenerative disc disease affecting multiple levels of her cervical spine with corresponding nerve root compression. (AR 53). Prior to November 15, 2007, Hughes noticed some tingling or loss of control in the fingers of her left hand, but she ignored it because she was trying to complete a 90-day probationary period working at Wiley Metal. (AR 56). Currently, Hughes experiences numbness and tingling mainly on the left side of her body; in her left arm, left leg, and in her left hand. (AR 52, 57). Hughes does not have much strength in her left arm, and while she can carry things with her right arm, she cannot do so for very long. (AR 57).

On November 15, 2007, Hughes fell while exiting her truck at home and the next thing she knew she woke up lying on the ground. (AR 49, 52). The fall broke the lower part of Hughes's left leg in three places. (AR 49, 52, 54). Hughes has weakness in her left side, which caused her strength to give out in her left leg and her subsequent fall out of the truck. (AR 52-53). Hughes went to the emergency room and Aaron LeGrand, M.D., performed surgery on her, putting intramedullary nails in her left leg. (AR 53).

Hughes's broken leg drew some pre-existing spinal conditions to her attention. (AR 49).

3

On December 14, 2007, a neurologist, Jeffery Kachmann, M.D., performed an anterior cervical fusion at three levels of Hughes's vertebrae, C4 through C7. (AR 57). Prior to the surgery, Hughes was experiencing pain in her neck, about a seven or an eight on a scale of one to 10. (AR 57). Following this surgery, Hughes no longer experiences pain, but her muscle use and nerve sensitivity have not returned. (AR 58).

Following the surgery on Hughes's spine, she completed 18 months of physical or occupational therapy, but did not regain all feeling or muscle strength in her left side and cannot walk like she used to. (AR 54, 58). Dr. Kachmann told her that there was nothing he could do about her loss of muscle strength and nerve sensitivity. (AR 58).

Sometime later, Hughes began to experience pain in her neck similar to the pain she had prior to her spinal fusion surgery. (AR 59). She consulted Dr. Kachmann, who recommended she undergo a second surgery on her cervical spine. (AR 59). In June 2013, Dr. Kachmann performed surgery on vertebrae C4 through C7 and also fused one vertebra above and one below the three he had previously worked on in Hughes's first surgery. (AR 59).

After the second fusion surgery, the majority of Hughes's pain went away, but she continues to experience stinging and numbness on the left side of her body. (AR 60). The numbness and tingling after the second surgery were greater than after the first. (AR 60-61). Hughes takes Hydrocodone for pain and muscle relaxers as needed. (AR 61-62).

Hughes's use of her hands, particularly her left, have been limited to some extent since her first surgery. (AR 75). For example, Hughes has been unable to pick up and pour a gallon of milk with her left hand or pick up a glass because of her diminished nerve sensitivity and grip strength. (AR 76-77). Similarly, the tingling in her left arm has been constant since her first surgery. (AR 76).

## C. Relevant Medical Evidence

### 1. Prior to the DLI

On October 27, 2007, Hughes went to the emergency room at St. Joseph Hospital for pain and numbness in her hands. (AR 259-60). X-rays showed that Hughes had "severe degenerative disc disease at C5-6 and C6-7. The disc spaces [were] markedly narrowed and there [was] hypertrophic change. There [was] mild retrolisthesis of C5 and C6." (AR 263). The report also noted "mild to moderate disc disease at C4-5." (AR 263).

Hughes went to the emergency room at St. Joseph Hospital again on November 15, 2007, because she had fallen out of her truck and fractured her leg. (AR 272-73). She underwent a tibial fracture fixation with an intramedullary nail. (AR 272, 285). Hughes was discharged three days later on November 18, 2007. (AR 272-88).

While in the emergency room for her fractured leg, Hughes also reported "a history of some neck pain over the years which has gotten worse over the past one year and . . . some increasing upper extremity numbness, weakness, and even pain . . . ." (AR 274). Thomas Reilly, M.D., F.A.C.S., opined that Hughes had cervical stenosis, spondylosis, and suspected myelopathy based on her complaints of numbness in her upper extremities. (AR 272). Dr. Reilly opined that Hughes exhibited the following issues: "some weakness of the triceps and intrinsic muscles on testing [] bilaterally"; "weakness of right [extensor hallucis longus] and right quadriceps," but her left side could not be tested due to recent surgery on her left leg; "some decreased light touch" sensation demonstrated in her upper extremities bilaterally and in "somewhat of a pandermatomal pattern"; positive Hoffman's testing; positive Babinski testing; and "moderate decreased range of motion of the cervical spine in extension and lateral rotation . . . ." (AR 275). A review of Hughes's x-rays revealed "some cervical spondylosis[,]

particular[ly] C5-6 and C6-7 with anterior osteophytes," and a somewhat elevated erythrocyte sedimentation rate of 34. (AR 275-76). Dr. Reilly diagnosed Hughes with: cervical stenosis, cervical spondylosis with suspected myelopathy, and cervical degenerative disc disease with radiculopathy. (AR 276).

Dr. Reilly referred Hughes for an MRI. (AR 254). On reviewing the results, Dr. LeGrand found moderate cord compression at C6-C7 with severe left and moderate right foraminal stenosis, and "a 4.2 mm [anteroposterior] dimension right central disc protrusion indents on the right hemicord." (AR 254). Dr. LeGrand diagnosed Hughes with multifactorial severe cord compression at C4 and C5-C6, with abnormal intramedullary cord T2 hyperintensity at these levels; and cord compression at C3-C4 and C6-C7, less severe than the other levels. (AR 254).

Hughes saw Dr. Kachmann on December 12, 2007, on an emergency referral basis. (AR 218). Hughes reported that "for the pa[s]t six months" she had "progressive bilateral left greater than right hand numbness and weakness, some gait difficulties, neck pain, and stiffness." (AR 218). Dr. Kachmann reported "weakness at 3-4/5" in Hughes's bilateral grip; "mild wrist extensor weakness on the left compared to the right and mild biceps and triceps weakness"; "numbness in the left C7 and C8 nerve distributions"; exaggerated reflexes in the left arm and normal in the right arm; exaggerated reflexes in the right leg; and positive Hoffman signs bilaterally. (AR 219). Dr. Kachmann found that Hughes had "severe cord compression" at three levels: C4-C5, C5-C6, and C6-C7. (AR 219). Dr. Kachmann opined that Hughes's condition warranted "emergen[cy] surgery," requiring "minimally an anterior cervical decompression and fusion fixation at the C4-5, C5-6, and C6-7 levels with a C5 corpectomy included as the C5 vertebral body appear[ed] to be impinging the [spinal] cord in its entirety . . . ." (AR 219).

On December 14, 2007, Dr. Kachmann performed surgery on Hughes to fuse some of her vertebrae and relieve the pain and numbness she had been experiencing. (AR 220-21). In particular, Hughes had a C5-C6 corpectomy with C4-C7 anterior cervical discectomy, fusion of vertebrae, with a Stryker Reflex Hybrid titanium plate and screw fixation. (AR 220). Following the surgery, Hughes received a physical therapy consultation for ambulation assistance. (AR 220). She was discharged on December 17, 2007. (AR 220).

Hughes saw Dr. Kachmann for a follow-up appointment on January 28, 2008. (AR 236). Hughes reported that "things ha[d] been going well[,]" that her symptoms were improving, and that the only discomfort she experienced was in and around her hip from the incision. (AR 236). Hughes was instructed to continue wearing her cervical collar for two weeks (for a total of eight weeks). (AR 236).

On March 19, 2008, Hughes went to another follow-up appointment with Dr. Kachmann. (AR 232). Hughes reported that she was doing well, that she had gained better control of her hands to the point where she was able to open jars and do most things that she had not been able to do prior to the surgery. (AR 232). However, Hughes continued to experience occasional numbness and tingling in her hands, which had only become slightly better. (AR 232). Because Hughes was doing so well, Dr. Kachmann did not schedule any additional formal follow-ups. (AR 232).

On May 14, 2009, Hughes went to the emergency room for a cough and sore throat. (AR 267-68). The attending physician diagnosed her with an upper respiratory infection, bronchitis, bronchospasms, and acute viral syndrome. (AR 268). Hughes was discharged that same day and given a prescription. (AR 270).

On June 21, 2011, Hughes went to the emergency room again, complaining about upper

respiratory problems. (AR 258). The attending physician treated Hughes for bronchitis, headaches, and sinusitis and instructed her to stop smoking. (AR 258). Hughes was discharged the same day. (AR 258).

## 2. After the DLI

On February 19, 2013, A. Dobson, M.D., a state agency physician, reviewed Hughes's record and determined that there was insufficient evidence to evaluate her disability claim as of her DLI. (AR 89-92). A second state agency physician, J. Sands, M.D., reviewed Hughes's record on June 13, 2013, and confirmed Dr. Dobson's opinion. (AR 94-98).

On May 13, 2013, Hughes saw Dr. Kachmann for a re-evaluation. (AR 315). Hughes reported "that she did see some improvement immediately after surgery but over the last six months [she] ha[d] noticed progression in her symptoms." (AR 315). In particular, Hughes reported that she "continued" to have upper extremity numbness and tingling "in addition to some right thumb and first digit numbness." (AR 315). Hughes reported that these symptoms "ha[d] been unchanged." (AR 315). She reported "an increasing amount of neck discomfort and the left leg giving out on her." (AR 315).

Dr. Kachmann found that Hughes's motor strength in her upper extremities bilaterally was 5/5, but that her grip strength was weak at 3/5 bilaterally and her triceps were weak at 4/5. (AR 315). Hughes's reflexes were decreased diffusely, her Hoffman signs were positive bilaterally, and her lower extremity strength was 5/5 bilaterally. (AR 315). X-rays showed grade one anterolisthesis of C7 on T1, minimal anterolisthesis of C3 on C4, and minimal increased anterolisthesis of C3 and C4. (AR 313-14).

On June 3, 2013, Dr. Kachmann reviewed the results of a cervical MRI of Hughes. (AR 304). The MRI showed: at C3-C4, disc degeneration and bulging, minimal posterior vertebral

8

spurring, facet arthropathy in the left greater than the right; posterior ligamentous hypertrophy and mild to moderate central spinal stenosis; at C4-C5, post fusion changes; at C5-C6, post fusion changes, posterior ligamentous hypertrophy, mild to moderate bilateral foraminal stenosis, and chronic uncovertebral spurring; at C6-C7, post fusion changes and uncovertebral spurring on the left with mild left-sided foraminal stenosis; and at C7-T1, right paracentral disc protrusion, ventral cord impingement, and moderate spinal stenosis. (AR 305). Dr. Kachmann gave Hughes the following diagnoses: a right paracentral C7-T1 disc protrusion with ventral cord impingement and moderate spinal stenosis; a small area of focal spinal cord cystic change suggesting myelomalacia on the right at C6; and degenerative changes with mild to moderate central spinal stenosis. (AR 305).

On June 13, 2013, Hughes underwent a second cervical spine surgery. (AR 299). During the surgery Dr. Kachmann performed the following procedures: removing the C4-C7 Stryker plate and screws, anterior cervical plate and screws; anterior cervical decompression at C3-C4, Zimmer TM-100 interbody cage arthrodesis; partial takedown of superior end of C5-C6 strut graft with Zimmer TM-100 interbody cage arthrodesis; C3 through strut graft C5 level, Pioneer sequence anterior cervical plate and screw fixation; and C7-T1 anterior cervical discectomy, decompression, Zimmer TM-100 interbody cage arthrodesis, with Pioneer sequence anterior cervical plate and screw fixation, C7 through T1. (AR 299).

On July 24, 2013, Hughes had a post-procedure follow-up visit with Dr. Kachmann. (AR 296). Hughes reported little or no neck pain, but "quite a bit of tingling in her upper extremities, right greater than her left." (AR 296). Hughes stated that she had experienced the tingling "for quite some time" but it was currently more pronounced. (AR 296). Hughes told Dr. Kachmann that it was very difficult for her to grab objects or perform fine motor movements with her hands,

9

and that this trouble had been ongoing since before her first surgery in 2007. (AR 296).

Hughes saw Dr. Kachmann for another follow-up on December 18, 2013. (AR 295). Hughes reported that she was "doing well" and that she had posterior neck spasms occasionally, but they were getting better. (AR 295). Dr. Kachmann noted that Hughes had "some residual numbness in her upper extremity which ha[d] been there since prior to her first surgery." (AR 295). X-rays showed that Hughes's multilevel cervical fusion appeared stable. (AR 293).

On April 21, 2014, Hughes saw Dr. Kachmann for another follow-up. (AR 290). Hughes reported constant posterior neck pain and spasms that she had experienced "ever since her first surgery." (AR 290). Hughes reported continued left upper extremity tingling, numbness, and weakness, which were unchanged since her first surgery. (AR 290). Hughes reported taking Valium for muscle spasms and Norco sparingly. (AR 290). Hughes's upper extremity motor strength was 5/5 with the exception of her bilateral grip strength, which was weak at 3/5. (AR 290). Her triceps were weak bilaterally at 4/5. (AR 290). Hughes's reflexes were absent diffusely, and Hoffman signs were negative bilaterally. (AR 290). Her sensitivity to pinpricks was decreased diffusely in her left arm and diffusely in her right arm. (AR 290). Dr. Kachmann opined that "due to the severity of her cervical spine and severity of her cord compression in 2007, and again in 2013, [it is] likely the symptoms that she has now are what she is going to be left with." (AR 290). Dr. Kachmann noted that "[m]ost of these symptoms are residual from the 2007 pre-op[eration]." (AR 290).

On April 22, 2014, Dr. Kachmann completed a residual functional capacity ("RFC") questionnaire, noting that Hughes was physically incapable of working eight-hour days, five days a week on a sustained basis. (AR 380-81). Dr. Kachmann opined that this assessment reflected Hughes's RFC as of December 12, 2007. (AR 382).

10

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id*. Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id*. Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id*.

### IV. ANALYSIS

*A. The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C.

§ 423(d)(3).

In determining whether Hughes is disabled as defined by the Act, the ALJ conducted the first two steps of the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id*. The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Id*. at 885-86.

### B. The ALJ's Decision

On September 15, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 22-36). At step one, the ALJ found that Hughes had not engaged in substantial gainful activity since her alleged onset date of November 18, 2007, through the DLI of December 31, 2011. (AR 27). At step two, the ALJ found that Hughes had the following medically determinable impairments: a left leg fracture requiring repair surgery in November 2007, and cervical spondylosis with spinal cord compression at C4-C7 levels,

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC, or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 404.945(a)(5).

12

requiring cervical fusion surgery in December 2007. (AR 27). However, the ALJ determined that as of the DLI, Hughes did not have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities for 12 months. (AR 27). Accordingly, the ALJ determined that Hughes was not disabled from November 18, 2007, the alleged onset date, through December 31, 2011, the DLI. (AR 27). Hughes's claim for DIB was therefore denied. (AR 33).

### C. The ALJ's Step-Two Determination is Flawed

Hughes argues that evidence in the record—that is, symptoms caused by severe degenerative disc disease and her December 2007 cervical spine surgery—was sufficient to satisfy the low threshold required for a severe impairment at step two. Hughes contends that the ALJ erred by finding that her condition improved during her gap in treatment, from March 2008 to May 2013, and that her condition was not severe for 12 months as required to survive step two. The Commissioner responds that Hughes did not carry her burden at step two, as shown by the lack of evidence of Hughes's alleged symptoms for the duration of a 12-month period. The Commissioner maintains that the ALJ correctly determined that Hughes's gap in treatment was likely due to her symptoms not being severe enough to require medical attention.

A claimant's burden at step two is a "*de minimis* screening for groundless claims." *Thomas v. Colvin*, 826 F.3d 953, 960 (7th Cir. 2016) (citing *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d. Cir. 2003)); *see Cotie v. Colvin*, No. 1:14-CV-07314, 2016 WL 5415045, at *9 (N.D. Ill. Sept. 28, 2016); *Munns v. Colvin*, No. 13-CV-264, 2016 WL 755653, at *2 (W.D. Wis. Feb. 25, 2016). A claim can only be denied at step two if the claimant's abnormalities "do not significantly limit the claimant's ability to perform basic work activities including 'walking, standing, sitting lifting, pushing, pulling, reaching, carrying, or handling.'" *Thomas*, 826 F.3d at

13

960 (quoting 20 C.F.R. § 416.921); *see Newell*, 347 F.3d at 546 (denying a claim at step two is only permissible if the abnormalities "do not significantly limit any 'basic work activity'" (quoting *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987) (O'Connor, J., concurring))). "Reasonable doubts on severity are to be resolved in favor in the claimant." *Newell*, 347 F.3d at 547 (footnote omitted); *see* SSR 85-28, 1985 WL 56856, at *4 (Jan. 1, 1985).

Here, the ALJ found that Hughes had not satisfied the *de minimis* standard for proving a severe impairment at step two, in part because the ALJ did not find her symptom testimony credible. The ALJ discredited Hughes's symptom testimony finding that: (1) Hughes's gap in treatment from March 2008 to May 2013 establishes that her symptoms were not severe during that time; and (2) the severity of Hughes's symptoms was not supported by objective medical evidence.[5] For the following reasons the Court concludes that the ALJ's credibility determination, and thus his step-two determination, must be remanded.

### 1. Applicable Law Regarding Credibility

An ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *Nelson v. Apfel*, 131 F.3d 1228, 1237-38 (7th Cir. 1997). If an ALJ's creates "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citation omitted), his determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)

---

[5] Hughes also argues that the ALJ erred by discrediting her testimony based on the date that Hughes filed for DIB. To the extent that the ALJ may have used this to discredit Hughes's testimony, the Commissioner does not respond to this argument and so has waived her opportunity to do so. *See Webster v. Astrue*, 580 F. Supp. 2d 785, 794 (W.D. Wis. 2008) (explaining in a social security appeal that undeveloped arguments are deemed waived) (citing *Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d 674, 679 (7th Cir. 2007)).

(remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness"); *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1995) ("[Because] the ALJ is in the best position to observe witnesses, [courts] usually do not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong." (citations omitted)).

2. Hughes's Gap in Treatment

"[I]nfrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where a claimant does not have a good reason for the failure or infrequency of treatment." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008); *see Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014). However, "the adjudicator must not draw inferences about an individual's symptoms and their functional effects from a failure to seek treatment without first considering any explanation that the individual may provide."[6] SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996); *see Hoffman v. Astrue*, No. 10-C-1152, 2011 WL 3236176, at *10 (E.D. Wis. July 27, 2011).

In particular, courts have found it questionable for an ALJ to determine that an impairment is not severe based on "the fact that a 'claimant may be one of the millions of people who did not seek treatment'" until late in the day. *Newell*, 347 F.3d at 547 (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)); *see Roper v. Astrue*, No. 2:07-CV-247-PRC, 2008 WL 1925073, at *9 (N.D. Ind. May 1, 2008) ("Many circuits have upheld the inability to afford medications or regular doctors visits as a valid excuse for failing to follow a prescribed course of treatment."). Even where the claimant's justification for a failure or infrequency of treatment is

---

[6] Social Security Ruling 96-7p, was superseded by Social Security Ruling 16-3p, 2016 WL 1119029 (Mar. 16, 2016), in March 2016, but Social Security Ruling 96-7p governed at the time the ALJ issued his decision. Accordingly, SSR 96-7p applies to this case.

15

not fully explained, the ALJ should explore the record "as to the lack of medical care." *Craft*, 539 F.3d at 679; *see Thomas*, 826 F.3d at 960 ("The ALJ also noted Thomas's gap in treatment between August 2011 and September 2012, but the relevance of this detail to Dr. Rashid's opinion is unclear, and, in any case, the ALJ did not explore the reasons for this gap." (citations omitted)); *Beardsley*, 758 F.3d at 840 ("But the ALJ may not draw any inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care." (citations and international quotation marks omitted)).

Here, the ALJ found that Hughes's testimony that she experienced severe residual numbness and tingling after her first surgery was not credible in part because she had not received treatment for these symptoms between March 2008 and May 2013. (AR 31-32). At the hearing the ALJ did not explore why Hughes failed to receive treatment, and in the ALJ's opinion he did not flesh out any possible alternative explanations for the gap before concluding that Hughes's symptoms were "not such as to require treatment . . . ." (AR 31).

There is some evidence in the record suggesting that alleviated symptoms may not have caused Hughes to abstain from treatment. For example, Hughes ignored functional deficits in her upper extremities in 2007 because she wanted to complete a 90-day probationary period at her job. (*See* AR 30, 56). Hughes also testified that she quit smoking to save money, suggesting that she had financial limitations. (AR 68). Perhaps even more significantly, Hughes may have considered further treatment to be pointless, as she claimed that upon completing 18 months of physical therapy after her first surgery—in approximately June 2009—Dr. Kachmann told her that there was nothing he could do about her remaining symptoms. (AR 58).

The ALJ erred in failing to question Hughes about or explore this evidence, which raises "[r]easonable doubts," *Newell*, 347 F.3d at 547, regarding the ALJ's negative credibility

16

inference, *Craft*, 539 F.3d at 679 ("Here, although the ALJ drew a negative inference as to Craft's credibility from his lack of medical care, she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that Craft had reported an inability to pay for regular treatment and medicine."). Moreover, the Commissioner does not meaningfully respond to Hughes's argument or try to explain the ALJ's failure to "explore the reasons for the gap [in treatment]." *Thomas*, 826 F.3d at 960 (citations omitted). Keeping in mind that the "low threshold required to satisfy step two," *Munns*, 2016 WL 755653, at *2, the Court finds that the ALJ should reconsider the cause of Hughes's gap in treatment to ensure a "full and fair review of the evidence." *Perez on behalf of Velez v. Berryhill*, No. 16 C 7864, 2017 WL 3725505, at *5 (N.D. Ill. Aug. 29, 2017) (citation omitted).

### 3. Corroborating Evidence

"When an ALJ denies benefits, he must build an accurate and logical bridge from the evidence to his conclusion," *Chase v. Astrue*, 458 F. App'x 553, 556-57 (7th Cir. 2012) (citations and internal quotation marks omitted), though he "need not mention every piece of evidence," *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)). "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Id.* (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)); *see also Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). "The ALJ must evaluate the record fairly." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

Here, the ALJ found that Hughes's symptom testimony was inconsistent with Dr. Kachmann's reports, emphasizing the March 19, 2008, and May 13, 2013, reports in particular.

17

The ALJ noted "improved control of hands with only occasional hand numbness/tingling, the release of by Dr. Kachmann without restriction," in the March 19, 2008, report, and that the May 13, 2013, report, in general, did not corroborate the symptoms alleged in Hughes's testimony.[7] (AR 32 (referring to AR 232, 315)).

The Commissioner is correct that the March 19, 2008, report indicates that Hughes could do "most things that she had not been able to do prior to surgery" and that Dr. Kachmann did not believe that additional formal follow-ups were required at that time. (AR 232). However, Hughes also reported only slight improvement concerning the "occasional numbness and tingling in her hands." (AR 232). Similarly, the May 13, 2013, report suggests that Hughes's symptoms improved during her gap in treatment. Hughes reported seeing "some improvement immediately after surgery but *over the last six months* [she] noticed progression in her symptoms." (AR 315) (emphasis added). The Commissioner makes much of this passage, claiming that it establishes Hughes's symptoms were not severe until approximately six months prior to her May 13, 2013, evaluation by Dr. Kachmann.

Even if Hughes's symptoms improved immediately after her first surgery and worsened six months prior to the May 13, 2013, evaluation, this does not establish that Hughes's symptoms disappeared entirely during her gap in treatment. Indeed, the May 13, 2013, report notes that Hughes "ha[d] continued to have" numbness and tingling in her upper extremities, and that those symptoms "ha[d] been *unchanged*." (AR 315 (emphasis added)). Moreover, the ALJ did not

---

[7] The ALJ also discredited Hughes's testimony because in "several discussed E/R visits" Hughes did not report functional deficits, numbness, or weakness in her upper extremities. (AR 32). The Court notes that the ALJ exaggerates the number of emergency room visits between March 2008 and May 2013 as "several"; there were only two. (*See* AR 258, 267-68). Further, the lack of corroborating evidence of Hughes's functional deficits in these reports is somewhat understandable as Hughes was seeking treatment for cold and flu like symptoms. (*See* AR 258, 267-68). Moreover, the ALJ was not permitted to discredit Hughes's symptom testimony "solely because there is no objective medical evidence to support it" in those emergency room reports. *Myles*, 582 F.3d at 677.

mention Dr. Kachmann's reports on July 24, 2013, December 18, 2013, and April 21, 2014, in which Hughes claimed to experience functional deficits, tingling, weakness, and numbness in her upper extremities since before her first surgery in 2007 and into the present. (AR 290, 295, 296). Insofar as the Court can tell, Dr. Kachmann never "questioned the credibility of [Hughes's] self-reports about her problems." *Grisanzio v. Berryhill*, No. 16 CV 50197, 2017 WL 6988660, at *2 (N.D. Ill. Dec. 18, 2017). Thus, evidence that was not addressed by the ALJ corroborates Hughes's testimony that her symptoms were more than *de minimis*. *See id*. ("Here, there was both objective evidence (*e.g.* MRI scans from 2010), as well as subjective testimony that plaintiff was being affected by her Chiari malformation in ways that were more than *de minimis*.").

Again, the ALJ was not required to "mention every snippet of evidence in the record," *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012), but he was obligated to take "[g]reat care" not to end the inquiry at step two unless he could "determine clearly the effect of an impairment or combination of impairments" on Hughes, SSR 85-28, 1985 WL 56856, at *4. Reasonable doubts as to whether Hughes's symptoms "significantly limit[ed] [her] ability to perform basic work activities," *Thomas*, 826 F.3d at 960 (citation and internal quotation marks omitted), should have been resolved in her favor, *Newell*, 347 F.3d at 546 (footnote omitted).

To the extent that the ALJ considered whether evidence in the record corroborated Hughes's symptom testimony, he focused on evidence that supports a finding of non-disabled "while ignoring evidence" that raises reasonable doubt as to that finding. *Denton*, 596 F.3d at 419 (citations omitted); *see Perez on behalf of Velez*, 2017 WL 3725505, at *5 (finding error where an ALJ "completely failed to discuss or analyze that evidence in the course of reaching what appears to be an adverse credibility determination"). In fact, in determining that Hughes's impairment was not severe at step two, the ALJ appears to have "engaged in the type of extended

19

and critical analysis that is typically done in the later RFC analysis at Steps Four and Five." *Grisanzio*, 2017 WL 6988660, at *2. This was error, as the ALJ overlooked evidence in the record that Hughes's claim was more than "groundless" for purpose of surviving step two, *Thomas*, 826 F.3d at 960 (citing *Newell*, 347 F.3d at 546); *see Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination); *Grisanzio*, 2017 WL 6988660, at *2 ("The net effect is that the ALJ did not conduct an RFC analysis, where she would have had to look beyond the mere question of headache frequency and consider the totality of plaintiff's limitations. By prematurely deciding the case at Step Two, the ALJ denied plaintiff this alternative route to being found disabled. For this reason, a remand is warranted."). Therefore, the ALJ's determination at step two was flawed, and the Court will order a remand to reconsider the ALJ's step-two finding and the issue of Hughes's credibility.[8]

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Hughes and against the Commissioner.

SO ORDERED.

Entered this 29th day of March 2018.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

---

[8] Because the Court finds that remand is warranted due to the ALJ's step-two analysis, including the ALJ's failure to properly consider Hughes's credibility, the Court need not reach the remainder of Hughes's arguments for remand.

20